## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

ZURICH AMERICAN INSURANCE
COMPANY, as subrogee of Skanska USA
Civil Southeast, Inc. f/k/a Atlantic Skanska,
Inc; FIREMAN'S FUND INSURANCE
COMPANY, as subrogee of Skanska USA
Civil Southeast, Inc. f/k/a Atlantic Skanska,
Inc.; and SKANSKA USA CIVIL
SOUTHEAST, Inc. f/k/a ATLANTIC
SKANSKA, INC.,

                                                CIVIL ACTION FILE
         Plaintiffs,             NO. 1:09-CV-0666

vs.

SHEFFER ENGINEERING COMPANY,
INC. and DANIEL B. SHEFFER, II,
Individually,

                       Defendants.     /

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs Zurich American Insurance Company, Fireman's Fund Insurance Company, and Skanska USA Civil Southeast, Inc., f/k/a Atlantic Skanska, Inc., file the following Memorandum in Opposition to the Motion for Summary Judgment of Sheffer Engineering Company, Inc. and Daniel B. Sheffer, II:

## I.    Summary of Material Facts Raising Genuine Issues for Trial

This case arises from a November 9, 2007, collapse of a cofferdam at a construction site on the Chattahoochee River. At the time of the incident, Plaintiff

Skanska USA Civil Southeast, Inc., f/k/a Atlantic Skanska, Inc. (hereinafter "Skanska")[1] was in the process of building a new pump station under a contract with DeKalb County, Georgia. (1)[2]  The project consisted of building a new water intake and pumping facility that drew water from the Chattahoochee River and pumped it to a water treatment facility. (3) The pumping facility drew water from the Chattahoochee River by means of a reinforced concrete intake chamber and a series of large pumps.  (4).

The project design plans for the pump station showed the location, layout, and required excavation profile for the pump station and the foundation for the water intake chamber. (5) These design documents showed that the site required an excavation approximately 112 feet wide, 112 feet long, with a maximum depth of approximately 850 feet above mean sea level (MSL) (6, 7).  The base elevations/foundations for the water intake chamber and pump room were below the surface elevations of the river.  Therefore, the project required installation of a temporary dam, known as a cofferdam, made of metal sheet piles to hold back the river water while excavation and construction was completed.  (8)

---

[1] The other Plaintiffs, Zurich American Insurance Company and Fireman's Fund Insurance Company, are Skanska's subrogated insurance carriers.

[2] The numbers in parentheses reference the supporting numbered paragraph in Plaintiffs' Statement of Material Facts in Opposition to Defendants' Motion for Summary Judgment.  Full citations to the record supporting that statement are contained in Plaintiffs' Statement of Material Facts.

Skanska retained engineer Daniel B. Sheffer of Sheffer Engineering Company (hereinafter collectively "Sheffer") to design the protective system for the cofferdam. (9)  He was hired to provide a unitary design that would allow completion of the entire project. (10, 11)  Project Executive Dave Hall testified that Skanska hired Sheffer to provide a cofferdam design that would allow Skanska "to complete the entire excavation profile" for "the whole job." (11)  Project Manager Brad Jackson testified that Skanska hired Sheffer to provide a design that would allow Skanska to do what was necessary to build the entire pump station, including the water intake structure and all slabs for the pump station. (10)

Immediately upon his retention, Sheffer was provided with the design drawings showing "the whole excavation" and the "entire excavation profile" for the pump station, including "where the ultimate excavation was going to be for [the] pump station." (12, 15, 17).  The design drawings provided to Sheffer included drawing S-5 showing that construction of the pump station water intake chamber required excavating at a depth of approximately 850 feet MSL, which is 24 feet below the high river level of 874 MSL. (16).  In fact, drawing S-5 clearly showed that "the excavation profile required for the foundations [of the pump station] steps downward from EL 859 to EL 851, and even lower, to EL 847 in the area of the pump room." (37). Thus, the design drawings given to Sheffer plainly showed that Skanska was going to excavate deeper than 15 feet behind the raker

3

support system for the cofferdam.  (14).  Moreover, Skanska's Project Executive, Dave Hall, had conversations with Sheffer in which they discussed the "ultimate excavation" depth required for the pump station and the need for a cofferdam design that would be "good to go" to accommodate the excavation for the entire project.  (13, 30).

Sheffer designed a support structure for the sheet metal wall of the cofferdam that consisted of a horizontal metal beam, or waler, running the width of the cofferdam.  The waler, in turn, was supported by multiple diagonal "rakers." The rakers were additional metal beams attached at a 45-degree angle to the waler at one end, and imbedded in concrete "thrust blocks" buried in the ground on the other end.  (18, 19)  Sheffer provided Skanska a design drawing showing a profile view of how this support structure was to be installed. (18, 19) Although this drawing  showed the support structure in the immediate vicinity of the sheet metal wall of the cofferdam — a distance of about eight feet — it did not depict anything beyond the immediate vicinity of the cofferdam support structure.  (18, 19)  For the Court's convenience, a copy of Sheffer's design drawing is shown below:



SHEF 000096

Sheffer's design drawing showed a maximum excavation at the face of the cofferdam at the 859 MSL level, with the thrust blocks imbedded in concrete at

approximately the 857 MSL level.  (18, 19)   When he submitted his design on August 14, 2007, however, Sheffer admittedly knew that the excavation for the pump station foundation was going to be much deeper than 859 MSL (26). In fact, project drawing S-5, which was given to Sheffer, showed that the required excavation behind the cofferdam's raker support system would be as deep as 850 MSL. (7, 12, 14, 15, 16, 17).

On September 27, 2007, Skanska's Project Manager, Brad Jackson, faxed Sheffer another copy of drawing S-5 showing that construction of the pump station required excavating deeper than 859 MSL behind the rakers. (27) With that same fax, Mr. Jackson also sent Sheffer a marked up copy of Sheffer's own design drawing showing that the excavation for the water intake chamber behind the work bench and rakers "drops down into a pit" at an elevation below 859 MSL.  This is the same "pit" shown on drawing S-5.  (27)

In this September 27, 2007, fax transmission, Mr. Jackson asked Sheffer "to go back and recheck his design to make sure it was adequate for what we need to do."  (28)  He also stated that Skanska "will not proceed with the rake installation until you [Sheffer] have reevaluated the design with current conditions."   (28) Sheffer concluded that his cofferdam design could be "safely used," that Skanska could "proceed with the installation," and that "the rakers and walers could be installed as previously designed."  (29)   Sheffer would ultimately produce four

iterations of his design documents, but the waler and rake system never changed. (50)

Based on Sheffer's design documents, Skanska understood that Sheffer's cofferdam design took into account "the entire excavation profile" for "the whole job," which included the required excavation behind the rakers as shown on drawing S-5. (33). Skanska then installed the waler and rake system exactly as designed by Sheffer. (34, 35, 36, 39) Other than the digging required to install the thrust blocks, Skanska never excavated below 859 MSL while installing Sheffer's design. (34) Because Skanska interpreted Sheffer's 859 MSL limitation as applying only to the area on top of the raker system (22, 23), it continued excavating the project site in accordance with its plans. When the excavation reached approximately 851 feet, the cofferdam collapsed. (37, 38).

Zurich's investigating professional engineer, Pete Craig, determined that the planned excavation behind the rakers compromised the lateral support for the raker foundations designed by Sheffer, allowing them to translate inward and causing the cofferdam failure. (38) He also found that the failure could easily have been avoided if Sheffer would have designed the rakers such that they extended to an elevation lower than the bottom of the required excavation. (40) Mr. Craig opined that Skanska's excavation to the 851 MSL elevation "cannot be considered a deviation from Sheffer's design because that excavation was known to be required

to install the pump station foundation.   In addition, deposition testimony clearly shows that Sheffer was aware that this excavation was necessary." (39)

Sheffer now claims that his waler and raker design was only the first stage of an intended, but unspecified, two-stage design.   According to Sheffer, before excavating below 859 MSL, the rakers should have been relocated to allow additional excavation. (42, 43). However, this purported second stage design is not mentioned in any of Sheffer's four reports.  (46, 50, 51, 54)  Curiously, it is not even mentioned in Sheffer's motion for summary judgment.

Sheffer claims he discussed this two-stage process with Skanska's personnel on October 5, 2007.  (43)  He cannot, however, specifically identify any particular person with whom he allegedly had this discussion.   (44)   Sheffer claims he discussed this alleged second stage of his design with someone at Skanska by telephone.   (44)   Sheffer's time records, however, show that he was at the construction site on October 5, 2007, so his recollection of these events is clearly faulty.  (45)

Every project supervisor who has testified in this case — Project Executive Dave Hall, Project Manager Brad Jackson, and Project Manager Dan Hembree — have denied that any such discussion took place (47, 48, 49, 50). On the contrary, each of these witnesses testified that Sheffer prepared only a single design that would accommodate the entire excavation profile and allow Skanska to complete

the whole project.  (10, 11, 30, 33) Moreover, even though Sheffer claims he discussed a second design with Skanska on October 5, 2007, there is no mention of a "two-stage" process in his October 19, 2007, design iteration provided to Skanska only two weeks later.  (46)

If such a two-stage process was in fact contemplated by Sheffer, plaintiffs' professional engineer, Mr. Craig, has opined that "this should have been clearly indicated on the design sketches or reports provided to Skanska."  (55)  Further, Mr. Craig has opined that Sheffer's failure to clearly indicate the need for a supplemental or modified system to complete the excavation "violates the standard of care that a reasonable and prudent engineer should employ in the design of protective systems such as the cofferdam" at issue, and that "the collapse of the cofferdam was the direct result of the inadequacy of the design provided by Sheffer Engineering to accommodate the required excavation profile necessary to construct the pump station."  (56, 57)

## II.   <u>Argument and Citation to Authority</u>

Summary judgment is appropriate only if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  "There is a genuine issue of material fact if the non-moving party has produced evidence such that a reasonable fact finder could return a verdict in its favor."  *Greenburg v. BellSouth Telecommunications, Inc.,* 498 F.3d 1258, 1263

(11th Cir. 2007) (quoting *Waddell v. Valley Forge Dental Assocs., Inc.,* 276 F.3d 1275, 1279 (11th Circ. 2001)).  When deciding whether genuine issues of material fact exist, the court must "view all evidence, and make all reasonable inferences, in favor of the party opposing summary judgment." *Hendrickson v. Georgia Power Co.,* 240 F.3d 966, 969 (11th Cir. 2001).  "The inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Jeffery v. Sarasota White Sox, Inc.,* 64 F.3d 590, 594 (11th Cir. 1995).

"Summary judgment may be improper, even though the basic facts are undisputed, if the ultimate facts in question are to be inferred from them, and the parties disagree regarding the permissible inferences that can be drawn from the basic facts." *Alabama Farm Bureau Mut. Cas. Co., Inc. v. American Fidelity Life Ins. Co.,* 606 F.2d 602, 609 (5th Cir. 1979).  "[I]ssues of negligence, contributory negligence and proximate cause, the resolution of which requires the determination of the reasonableness of the acts and conduct of the parties under all the facts and circumstances of the case, cannot ordinarily be disposed of by summary judgment." *Gross v. Southern Ry. Co.,* 424 F.2d 292, 296 (5th Cir. 1969).  Further, questions regarding reasonableness and state of mind are typically reserved for a jury and not decided on summary judgment. *See Trucks, Inc. v. United States,* 234 F.3 1340, 1343 (11th Cir. 2000).

This is a case where many basic facts are undisputed, but the inferences drawn from those facts are clearly in dispute.  It is undisputed that the cofferdam collapsed because Sheffer's design could not support excavation to the 850 MSL elevation required to complete the project; however, there are many disputed issues of material fact as to who is ultimately responsible for the collapse. These disputed issues include whether Sheffer prepared faulty or ambiguous design documents which proximately caused the collapse; whether Skanska's interpretation of Sheffer's ambiguous design was reasonable; and whether Skanska reasonably followed or complied with Sheffer's design. There is also a disputed issue of material fact as to whether Sheffer ever contemplated a two stage design for the cofferdam support system.  If he did, there is certainly a disputed issue as to whether he adequately communicated that intent to Skanska.  These issues of reasonableness, state of mind, negligence, and proximate cause must be decided by the jury, and not by summary judgment. If any of these issues are resolved in favor of Plaintiffs, they will be entitled to a verdict.  Thus, summary judgment is inappropriate.

## A.    There is a genuine issue of material fact as to whether Skanska complied with Sheffer's design.

Sheffer's entire motion is based on the erroneous contention that "it is undisputed that Skanska did not construct the cofferdam in accordance with Sheffer Engineering's design because Skanska excavated approximately eight feet

below the maximum depth allowed by the design." (Defendants' Memo. at 7.) This contention is very much in dispute. In fact, plaintiffs' expert did not find any evidence that Skanska improperly followed Sheffer's design. (36). On the contrary, plaintiffs' expert specifically concluded that "Skanska's excavation to the 851 foot level cannot be considered a deviation from Sheffer's design because that excavation was known to be required to install the pump station foundation." (39). This expert testimony alone is sufficient to defeat the defendants' motion for summary judgment. There is also plenty of other evidence in the record to defeat the defendants' motion.

The evidence shows that Skanska gave Sheffer design drawings for the entire 112 foot by 112 foot project clearly showing that excavation would be required well below the 859 foot level, to at least a level of 850 MSL. (5, 6, 7, 14) Sheffer admits that he received these drawings. (15) Sheffer, however, provided a design that was focused on only a very small portion of the project site. (19, 20) Sheffer's entire drawing shows only a profile view of the area from the sheet pile wall of the cofferdam to the end of the rakers, a distance of approximately eight feet. (19, 20)

All of Skanska's project supervisors testified that Sheffer was retained to provide a design that would allow them to complete the whole project, which included the "entire excavation profile" and the "ultimate excavation" depth for the

pump station.  (9, 10, 11, 12, 13)  Thus, it was reasonable for Skanska's personnel to understand Sheffer's 859 foot excavation level as being restricted only to the area actually depicted in his drawing.  As Project Manager, Dan Hembree testified: "I'm not an engineer, I can only do what his drawings show me.  And his drawings show this area and don't – you know, he had the drawings showing the whole excavation.  He knows the depths of all the excavation, not, you know – before he designs his stuff."  (25)

Skanska installed Sheffer's waler and raker design exactly as shown on Sheffer's drawing.  (34, 35, 36, 39)  Skanska complied with Sheffer's design because it did not excavate below the 859 foot level in any area depicted in Sheffer's design drawing.  (34)  Even though Sheffer knew that construction of the project would require excavation well below the 859 foot level, he did not indicate anywhere in his design drawing or attached comments that his alleged prohibition on excavating below the 859 foot level extended to the entire project.  (21, 47, 50, 51, 54)  Sheffer also did not advise or warn Skanska that it could not excavate any deeper than 15 feet behind the raker system. (24) The collapse occurred when Skanska continued with the excavation behind the rakers – an area not shown on Sheffer's drawing -- in accordance with the project plans previously provided to and discussed with Sheffer.

Thus, there is clearly a question of fact as to whether Skanska's excavation

below the 859 foot level in an area not depicted in Sheffer's drawing constitutes a

deviation from Sheffer's design.   At a minimum, there is a genuine issue of

material fact as to whether the collapse was proximately caused by Sheffer's own

faulty design, as opposed to any deviation on the part of Skanska. As stated by

plaintiff's professional engineer:

> [T]he failure [of the cofferdam] was the direct result of
> the inadequacy of design provided by Sheffer
> Engineering to accommodate the required excavation
> profile necessary to construct the pump station at issue.
> To my knowledge there is no evidence that Skanska
> installed Sheffer's design improperly.   Skanska's
> excavation into the 851 foot level cannot be considered a
> deviation from Sheffer's design because that excavation
> was known to be required to install the pump station
> foundation.   In addition, deposition testimony clearly
> shows that Sheffer was aware that this excavation was
> necessary.

(Tab A and ¶¶ 39, 57 of plaintiffs' statement of undisputed material facts). (37, 54,

55).

**B.    The case law cited by defendants does not warrant summary judgment because there is a genuine issue of material fact as to whether the collapse was caused by Sheffer's ambiguous design.**

Defendants erroneously argue that summary judgment is proper under the

Georgia Court of Appeals' decision in *Covil v. Robert & Company Associates,* 144

S.E. 2d 450 (Ga. App. 1965).   *Covil*, however, actually supports plaintiffs'

position. In *Covil*, the plaintiffs sued an architectural and engineering firm that had

prepared the plans, specifications, and drawings for the construction of a water re-pumping station in DeKalb County, Georgia. The construction of the re-pumping station included the installation of a 24-inch pipe in the main pump room that was connected by a T-joint. During construction, the T-joint slipped off the 24-inch pipe because it was not adequately braced, causing millions of gallons of water to flow onto plaintiffs' property. *Id.* at 452.

Plaintiffs claimed the water damages were caused by the defendant's failure to clearly state in its plans and specifications that bracing was required for the T-joint. The defendant argued the damages were caused by the builder's failure to brace the T-joint as required by the plans and specifications. The defendant's specifications provided: "Bends, valves and other points where deemed necessary shall be blocked or harnessed to resist thrust." *Id.* at 454.

The Georgia Court of Appeals rejected the defendant's argument, finding that the specifications did not "clearly and definitely" require bracing, but were "at best ambiguous and subject to misinterpretation by the person whose job it was to carry the plans into effect." *Id.* The Court held:

> Although defendant might originally have conceived bracing for the T-joint, yet if it was negligent in expressing that concept by use of a provision which would be so interpreted as either to require or not to require the bracing and if the builder interpreted the provision as not requiring the bracing and plaintiffs consequently were damaged, then defendant's failure clearly to express the concept on paper would have the

> same effect as would a failure to conceive the bracing in the first place. The jury would have been authorized to find that the ambiguous provision was in fact a negligent failure to provide bracing for the T-joint which became disconnected.

*Id.*

The Court further held that the defendant would not be absolved of liability even if the builder had erroneously interpreted the plans and specifications, because the "defendant must be held to have anticipated the interpretation made by the builder whether or not that interpretation would constitute negligence on the builder's part." *Id.* [3]

Sheffer's design drawings and specifications in this case, like the plans and specifications in *Covil*, are "at best ambiguous and subject to misinterpretation." *Id.* Although Sheffer's design drawing showed a maximum excavation depth of 859 MSL (15 feet below the river's flood stage level), Skanska interpreted this to mean that it could not excavate below 859 MSL only in the area of the concrete work bench, i.e., the face of the cofferdam in the immediate area of the sheet pile wall directly on top of the rakers. (22, 23) Like the engineer in *Covil,* Sheffer

---

[3] Although the court in *Covil* held that the jury could find the engineer was negligent in preparing the plans and specifications for the T-joint, the court nevertheless granted the defendant's general demurrer because the plaintiffs had failed to plead that "the T-joint was installed according to the defendant's plans and specifications." *Id.* at 455. In contrast, plaintiffs in the present case specifically pleaded that "the cofferdam had been installed according to the plans and specifications provided by the Sheffer Defendants." (Amended Complaint, ¶ 19).

"must be held to have anticipated the interpretation made by [Skanska]," *Covil,* 144 S.E. 2d at 454, particularly since Sheffer admittedly knew that the required excavation for the pump station was going to be much deeper than 859 MSL. (21, 26)  In fact, when he was initially retained to design the cofferdam, Sheffer admittedly received the design plans for the pump station showing that construction of the water intake chamber required excavating to a depth of at least 850 MSL (24 feet below the river's flood stage level of 874 MSL).  (12, 14, 15, 16, 17) Sheffer, however, never advised or warned Skanska that it could not excavate any deeper than 859 MSL behind the raker system.   (24)   Nothing in any of Sheffer's four reports suggests that the 859 MSL limitation applied to the entire construction site, which he knew would go substantially deeper than 859 MSL. (14, 15, 16, 17, 21, 24, 26, 50, 51, 52, 53, 54)

Based on Sheffer's design documents, Skanska understood that Sheffer's cofferdam design took into account "the entire excavation profile" for "the whole job," which included the required excavation behind the rakers as shown on drawing S-5.  (33). Skanska then installed the waler and rake system exactly as designed by Sheffer.  (34, 35, 36, 39)  Other than the digging required to install the thrust blocks, Skanska never excavated below 859 MSL while installing Sheffer's design.  (34)  If Sheffer truly believed that Skanska could not excavate to the 851 foot level behind the rakers, then his "failure clearly to express [this] concept on

paper" authorizes the jury to find that he was negligent in preparing an "ambiguous" design that proximately caused plaintiffs' damages. *See Covil*, 144 SE2d at 454. Indeed, plaintiffs' expert has specifically concluded that the damages were caused by "the inadequacy of the design provided by Sheffer Engineering," who violated "the standard of care that a reasonable and prudent engineer should employ in the design of protective systems such as the cofferdam" at issue. (56, 57).

In short, there are genuine issues of material fact as to whether it was reasonable for Skanska to interpret the 859 foot excavation limitation in Sheffer's design as applying only to the area shown in the design drawing; whether Sheffer's design was ambiguous; whether Sheffer violated the applicable standard of care; and whether Sheffer's ambiguous design and breach of the standard of care proximately caused plaintiffs' damages. These issues of state of mind, reasonableness, breach, and proximate cause should not be decided on summary judgment. *See Trucks, Inc.,* 234 F.3d at 1343; *Gross,* 424 F.2d at 296.

**C.    There is a genuine issue of material fact as regarding whether Sheffer ever intended a "two stage" design for the cofferdam.**

It is undisputed that Sheffer's design as shown in his reports of August 14, 2007, August 20, 2007, September 27, 2007, and October 19, 2007, was insufficient to accommodate the excavation required to complete the pump station project. All of Skanska's supervisory personnel testified that Sheffer was retained

to provide a single design that would allow construction of the entire pump station project. (10, 11, 12, 13, 30, 33, 41) As Project Executive Dave Hall said, he discussed with Sheffer that it was his intent to have a design that, once installed, would be "good to go" for "the rest of the project." (30.) Further, as Project Manager Brad Jackson noted, Sheffer's design documents state that it was intended for use "until late February 2008." (31) By late February 2008, all the slabs on the bottom of the structure would have been poured (32), including the deepest excavation shown on sheet S-5, which Sheffer acknowledged receiving. (15, 16, 17)

Sheffer now claims, however, that his design was never intended to accommodate all of the excavation that would be required to complete the pump station project. Rather, he contends that his design was intended to allow excavation only to the 859 foot level, and that some unspecified "stage two" design would be required for excavations below 859 feet. (42)

Although Sheffer claims that he discussed this issue with Skanska personnel on October 5, 2007, he cannot identify any particular person with whom he had such a discussion. (43, 44) Sheffer's sole substantiation for this alleged conversation is a crude handwritten sketch dated October 5, 2007, which Sheffer claims represents his concept for the second stage of his design. (52) Sheffer claims that it was drawn in his office while he discussed the issue by telephone.

(44)  Sheffer's time records, however, show that he was at the project site on October 5, 2007, so his memory is clearly faulty.  (45)  Further, Sheffer admits that he never showed his sketch to anyone at Skanska.  (53)

All of Skanska's personnel deny that any discussion regarding a "stage two" procedure ever took place.  (47, 48, 49, 50)  Moreover, Sheffer's October 19, 2007, report deals solely with a bracing system for the permanent sheet pile walls adjacent to the cofferdam.  (46)  The report does not indicate any changes to his "stage one" design for the cofferdam support system, nor does it contain any mention of a "stage two" design for the support structure for the cofferdam, which Sheffer claims he discussed with Skanksa personnel and sketched out only two weeks earlier.  (46)

Based on this contradictory evidence, including Sheffer's clearly faulty memory regarding where he was on October 5, 2007, there is certainly a genuine issue of material fact as to whether Sheffer ever intended his cofferdam support structure to be part of a two stage system.  All of Skanska's personnel understood his design to be a unitary design that would accommodate the entire pump station project, because that is what he was asked to design.  Indeed, none of the four iterations of Sheffer's reports makes any mention of a two stage process for completing the excavation that he admittedly knew would be required to construct the pump station.  Most telling, even Sheffer's October 19, 2007, report has

absolutely no mention of a second stage for the cofferdam support system, even though, if Sheffer is to be believed, he had a specific discussion (albeit with an unspecified person) regarding this very matter only two weeks earlier on October 5, 2007.  The only new material in Sheffer's October 19, 2007, report deals with a method to provide bracing for the permanent sheet pile walls.

Given that every Skanska representative has testified that their intent was to obtain a single design from Sheffer that would accommodate the entire pump station project, and that no discussion of a two stage process ever occurred, and given that there is not a single mention in any of Sheffer's documents of a "second stage" for the system, there is certainly a genuine issue of material fact as to whether a "second stage" ever existed, either on paper or in Sheffer's mind.  If no such "second stage" was ever contemplated by Sheffer, then Plaintiffs will clearly be entitled to a verdict in their favor because all parties agree the design that failed was insufficient to accommodate construction of the entire project.  Accordingly, Sheffer is not entitled to summary judgment.

> **D.     Assuming Sheffer actually intended a two stage design, there is a genuine issue of material fact as to whether Sheffer adequately conveyed that intent to Skanska.**

Even if Sheffer contemplated a two stage design for the cofferdam, he is still responsible for the cofferdam collapse if he failed to communicate that intent to Skanska.  All of Skanska's personnel have testified that Sheffer was retained to

provide a single design that would accommodate the entire project. If Sheffer believed that a single stage design was impossible, he should have clearly communicated that to Skanska. Skanska's personnel have testified that they would have expected Sheffer to advise them if such was the case. (48, 49)

Sheffer has admitted that his existing reports do not indicate the need for a "stage two" design prior to excavating below 859 MSL. When asked why he did not indicate in his reports that there would need to be changes to the protective system in order to excavate deeper than the 859 level, Sheffer testified: "I didn't feel that there was a need to have to reiterate discussions that had already been under the understanding [sic] between myself and Skanska personnel on what could or couldn't be done and what the limitations of the design were at this particular stage." (51) Failure to provide this critical information, however, is a deviation from the standard of care expected of a professional engineer.

Plaintiffs' engineer Pete Craig has opined that if "a supplemental or modified system was required to safely excavate the site to the required profile this should have been clearly indicated on the design sketches or reports provided to Skanska. Failure to do so, in our opinion, violates the standard of care that a reasonable and prudent engineer should employ in the design of protective systems such as the cofferdam" at issue. (55,56)

Thus, even if Sheffer actually contemplated a two stage process, he failed to abide by the standard of care expected of a professional engineer by not including this "two stage" concept in the design documents and reports provided to Skanska. As a result, all of Skanska's personnel understood his design to be a single stage design that would allow completion of the entire pump station project. Because all parties agree that the design was in fact inadequate for construction of the entire pump station project, it is an issue for trial as to whether Sheffer's failure to adequately communicate his two stage plan to Skanska (if such was actually his intent) is the cause of this loss. Accordingly, Sheffer is not entitled to summary judgment.

## III.   Conclusion

As discussed above, there are several issues of material fact that preclude granting summary judgment to Sheffer. There are disputed issues as to whether Skanska's excavation below the 859 foot level outside of the area shown in Sheffer's ambiguous design was actually a deviation from Sheffer's design, as claimed by defendants; whether it was reasonable for Skanska to interpret the 859 foot excavation limitation in Sheffer's design as applying only to the area shown in the design drawing; whether Sheffer's design was ambiguous from the start; whether Sheffer violated the applicable standard of care; and whether Sheffer's ambiguous design and breach of the standard of care proximately caused plaintiffs'

damages. There are also issues of material fact as to whether Sheffer actually contemplated a two stage process for his design and, if he did, whether that concept was adequately communicated to Skanska.  These are issues that may be decided only by the jury.  Therefore, Sheffer is not entitled to summary judgment.

This _____ day of April, 2010.

s/Albert G. Dugan
Albert G. Dugan
Georgia Bar No. 232122

s/David M. Bessho
David M. Bessho
Georgia Bar No. 055784
Cozen O'Connor
SunTrust Plaza, Suite 2200
303 Peachtree Street, N.E.
Atlanta, Georgia  30308
Counsel for Plaintiffs
Telephone:  (404) 572-2000
Facsimile:   (404) 572-2199
adugan@cozen.com
dbessho@cozen.com

## CERTIFICATE OF SERVICE

I, David M. Bessho, hereby certify that on _____, 2010, I

electronically filed the foregoing with the Clerk of Court by using the CM/ECF

system which will send a notice of electronic filing to the following:

Amber E. Tuggle
Stephen J. Rapp
Weinberg Wheeler Hudgins Gunn & Dial
950 East Paces Ferry Road
One Atlanta Plaza, Suite 3000
Atlanta, Georgia 30326

s/David M. Bessho
David M. Bessho
Georgia Bar No. 055784
Cozen O'Connor
SunTrust Plaza, Suite 2200
303 Peachtree Street, N.E.
Atlanta, Georgia  30308
Counsel for Plaintiffs
Telephone:  (404) 572-2000
Facsimile:   (404) 572-2199
dbessho@cozen.com